number 18-3028. Take your time. We're on the clock, so we're, that's true. That's good. Take your time. No worries. You can come on up, please. Good morning. May it please the court, Timothy Coriston from the law firm of Conopoly on behalf of the appellant would like to reserve three minutes for rebuttal. That'll be granted. Thank you. I'm going to first address the forum selection clause. The review, this is a matter of a question of law. It should be a plenary review. Just one second. If we were to find no jurisdiction, do we need to get to this clause? No. Okay. Do you want me to start with jurisdiction? On the flip side, if we find that the forum selection clause should be enforced, then we don't need to get into the jurisdictional issue, do we? Correct. Okay. We've got two roots here. Two threshold issues. And for sake of argument, let's just say you're curious about the personal jurisdiction piece of this. Would you agree that the test here is three-fold? You first have to ask about minimum contacts. Then you have to ask whether those minimum contacts are the things that gave rise to the cause of action. And then after those inquiries, you have to ask the question, does exercise of jurisdiction comport with notions of fair play and substantial justice, right? Yes. Okay. That's the analytical construct. And the Supreme Court's given several factors to look at to try to figure out whether an exercise of jurisdiction comports with substantial justice and fair play. So answer, if you would, the argument that your opponents make that this is a foreign corporation. The plaintiff is not based, you're not based in Pennsylvania. So there's really not an interest here in Pennsylvania. And it's just like in Asahi, it's not fair. It's fundamentally unfair to drag a foreigner into a jurisdiction where even the plaintiff doesn't have a significant tie. Well, Your Honor, our rights arise out of equitable contribution because we have two concurrent insurance policies. Correct? We're well familiar with that. Okay. They wrote the policy for a Pennsylvania insured order, U.S., which is a named insured in their policy. And I'm giving you, for the sake of discussion, I'm giving you minimum contacts. Okay. So assume for the sake of argument that we said, you know what, you wrote the policy or you adopted the local underlying policy into the global policy and you knew it was going to cover Pennsylvania. So assume we said, okay, that's minimum contacts and get to the that last of the three steps, fair play and substantial justice. Their argument is liberty is not a Pennsylvania resident. They've got no, you know, Pennsylvania's got no cause to say we're looking out for liberty and liberty's got no call on Pennsylvania. And we're, you know, we're a European, we're a Belgian company. Leave us alone. Well, I think Pennsylvania, yes, Pennsylvania has a strong interest here because had we not stepped up and paid the claim, their insured might have been placed in a very difficult position where they would have had maybe three jurisdictions to pursue the claim against AXA CS, AXA U.S. and us. So ultimately, the interest is derivative of the insurance and the insured, which has a strong interest to ensure that it has the benefits of its policy. Speak to a site where the court said in a case not unlike this, a product case, not an insurance case, but said, look, when you're dealing with foreign corporations, these issues are just more serious, more significant. It's not a light thing to call a foreign corporation into the jurisdiction. Well, this foreign corporation has significant contacts with Pennsylvania, and it's not where they just wrote. Four letters. Right. Four letters and a subsidiary that does business here. A subsidiary where they directed that that subsidiary place insurance for this insured. They were aware that part of U.S. was in Pennsylvania. Right. And they also had the other contacts of writing other policies. Do we ignore the corporate separateness? Because that sounds like what you're telling us to do. No, I don't think you ignore it, but they actually reached into Pennsylvania and acted with their subsidiary, and then that policy was absorbed into theirs. They also entered into a letter of comfort with a Pennsylvania company, which was a critical factor in Liberty paying the claim with the recognition that there was a contribution claim. So they actually entered into an agreement pertaining to the contribution, which Liberty relied upon and ARDA U.S. relied upon for purposes of resolving the Liberty claim and then the pursuit of the contribution. I'm right, though, that we're not even here talking about AXA U.S., right? Any claim you've got against them, you've got against them. That's not what we're talking about. Right, but that letter of comfort was with AXA CS. And it was critical to the contribution and our payment under the policy. And their argument is you've got two separate claims going on here, two separate arguments to make, one against AXA U.S. and one against AXA CS. So making you go after them on their home turf is not a burden on you because you'd have to make two different kinds of arguments under two different pieces of this policy in any event. What's wrong with that argument? All right. So, Judge, we wrote a policy with a venue selection clause for New York. They wrote one for Ireland, right? We have an equitable right of contribution, which the courts have recognized is necessary for purposes of ensuring justice. So when two people pay, they acknowledge it in a letter of comfort. They got involved in the local dispute. And therefore, why should we, on a loss that arose in the Pennsylvania, Pennsylvania insured, which was identified in their policy specifically, and which was both on the global level and on the local level, why should we have to go to Ireland where the law is different on an equitable contribution claim that arises out of a loss in Pennsylvania? They came into Pennsylvania. They were part of both as a global policy and as the local policy, and then they entered into a letter of comfort. Yeah. Of course, their argument is they didn't come into Pennsylvania, right? That's the point we're circling around here. Right. But let me ask one more thing. Well, I lied. Let me ask two things. One is, is there a sliding scale here? If we were to view the minimum contacts here as pretty weak, would that put a heavier burden on you to show fair play and substantial justice, a stronger showing? Well, I think they're independent. If you establish one, then you have to establish the other. And here, again, given their contacts and also the fact that they have the right policies in Pennsylvania, apart from these policies, they go to surplus policies, they're a registered surplus carrier, they are in this jurisdiction. They actually paid the brokers. Right. That's not my question. Then I'm sorry. My question is there's some case law coming out of the Second Circuit and some other places that seems to indicate that if you're looking at these contacts, and the minimum contacts looks sort of weak, then the person arguing for jurisdiction has to make a stronger case that this really is a fair outcome to hail them into court. And I'm just wondering if you agree with that legal proposition. Well, I certainly don't want to judge, but I would say this also. Pennsylvania has a long-arm statute specifically for insurers who insure Pennsylvania Insured. They insured a Pennsylvania Insured directly as the global company. So Pennsylvania certainly considers the fact that they're going to be subject to jurisdiction and they knowingly entered Pennsylvania in that capacity by incorporating the policies and by paying brokers, paying taxes in Pennsylvania on the ceded policies, both this ceded policies and other ceded policies. So I don't think it offends. I think it's very clear. So in essence, they're subject to jurisdiction anywhere in the world where they've got either themselves or in a subsidiary that's got a policy. I think it's more than that, Your Honor, because they wrote insurance for the subsidiary as a named insured and they're doing business in Pennsylvania extensively, both as a surplus carrier and through the ceding of policies. It's not just a case where it's happenstance. They're connected to Pennsylvania. Your claim is riding on that assertion that it rises out of the policy. So switch gears for a second here. Why should you get the benefits of all that and then be able to say, but you know what, as for the foreign selection clause, we don't get any of the burdens. We get all the benefits associated with the policy here and there, but we don't have to pay any attention to the limitations. Your Honor, I don't think we're getting the benefits in the context of what the court has permitted for equitable estoppel purposes. You're saying your claim comes out of the insurance. You're saying you got a right and you're saying it's because they wrote the policy. So you're claiming, in effect, a contribution based on the policy. Why do you get the benefits but you don't get the burdens? Because it's an incidental benefit, not a direct benefit, because had they paid their portion and we paid our portion, nobody would have to try to reach against the other. And what the Pennsylvania law and general accident recognizes is the respective obligations as between several insurers who have covered the same risk do not arise out of contract. When you just said, that's kind of putting the rabbit in the hat, covering the same risk. We're not on the merits here, but I understand their argument to be they're not on that risk. ARDAC bought a policy for recall from you guys. That's why they got it, because it wasn't covered by the ACSA policy. So they went to you and you're trying to dodge your responsibility and pull them in. I understand an underlying merits dispute, but, you know. Can I just, Judge, neither policy was- Let's put two more minutes on the clock. Thank you. I'd like to deal with form selection. Okay. Just on this issue, which I think I'm now addressing, is the policies didn't know about each other. It just happened that they were concurrent, ended up having concurrent. So we were not, they were not, we were not filling a gap. They have recall insurance direct if their local policies do not have it, which is the contention in this case. So for purposes of considering this, we're entitled to the benefit that there is a claim against them for that, and we'll address that on the merits as we move forward. But even in McGraw Hill, where the photographers entered into an agreement with Corbis, Corbis with McGrail Hill, which ultimately the money went to McGraw Hill, and the court said that's not a direct benefit. This is purely incidental. It's happenstance. That policy was not taking out anything to do with ours. You had the U.S. subsidiary take out all policy, likely unaware that they were covered by the other policy, and now we're both here. And, again, you know, so it's the principle is equitable contribution, which the court says is important to accomplish justice. Did you forfeit arguments associated with this form selection clause? No. Like foreseeability. No, because, first of all, it's their. Well, I didn't see it anywhere in the briefs. How is it not forfeited? Because it's a question of law, and it shouldn't be waived, and it was their obligation. First of all, we now have McGraw Hill, which we didn't have then, and which says foreseeability is a prerequisite which they must produce evidence of. And, clearly, neither policy was aware of the other at the time they were entered, so there is no foreseeability. Yeah, but that kind of dodges the point, which is you need to make the argument about foreseeability, don't you? Is it? It's a prerequisite. I'm sorry. Go ahead. It's a prerequisite for finding that we're bound by it. We don't even get there because we don't have a direct benefit, by the way. But I think the court, given McGraw Hill and the strong policy in that case, that it's a prerequisite and they have to be proof of it at the time we entered our contract. Policy. Neither policy, there's no proof that either one was aware of the other. Let me ask you about the scope of the forum selection clause. Do you concede that at least counts one and three fall within the scope of the forum selection clause? In what respect, Your Honor? I'm sorry. Well, I view your argument more as count two can't be within the forum selection clause. Well, the forum selection clause, we're moving on the basis of equitable contribution. They refuse to give us, provide an assignment. So that's our cause of action. And it clearly, you know, there is no foreseeability when people don't know about each other's policies. And even in Halmedica, the court indicated with the sales representative, one wouldn't know that the other was bound. And even if they did know they were bound, they wouldn't construe it as applying to them because we're not insured under that contract. We have an equitable right of contribution in order to ensure justice and for public policy reasons to have an insurer step up and pay. So we're basically having a situation where Pennsylvania recognizes and the country recognizes to give this right of contribution to ensure justice. And now we're trying to say you have the right of contribution because you stepped up and you paid and now you can pursue this other party who's responsible. Oh, but now you have to go to Ireland to do it under a different law than the law that gives you the right of contribution. It's not fair and it doesn't make sense. Okay. Okay. Thank you, counsel. Thank you. Get you on rebuttal. May it please the court. Michael Ledley from Walmart Mar & Deutsch for appellant ACSA corporate solutions assurance essay, which I'll refer to as ACSA CS here. Your Honor, I was prepared to address the form selection clause first, but it sounds like the court may be more interested in addressing it. I think you'd like to address that too, but you can start any way you like. Sure. Well, I'll start where Judge Jordan started, which is a bit unusual in the jurisdictional context. Normally the fair play and substantial justice comes last, but I think here it's fundamental to the case because what due process is all about is allowing a party to structure their primary conduct. And that's exactly what ACSA CS did here. It has this global policy with Luxembourg insured that covers companies in 25 different countries. Would you acknowledge that you've got minimum contacts in Pennsylvania? I would not, Your Honor. I'm happy to address that as well. Well, you ought to. I mean, if you write a policy where you adopt, and you deliberately pull in a policy that you know has been written to cover an area, how is that not availing yourself of the benefits of that law? For a couple of reasons. First of all, there's no direct contact with Pennsylvania in connection with the policy. The policy was issued to a Luxembourg insured.  It was issued by a French company out of their U.K. office. It's governed by Irish law. And the global policy says if you're going to have coverage in certain places, then you've got to have a local underlying policy, and that local underlying policy is adopted into this policy. And you did that in this case. You had one of your subsidiaries write a policy for the insured, and that, by the function of the contract you wrote, became part of the global policy, did it not? The local underlying policy that actually U.S. issued did become part of the global, the actual global policy. That's correct. So, I mean, you can name all the other countries, but at the end of the day, you established, you ordered your affairs in a way that made a policy to cover risk in Pennsylvania part of the global policy. Why is it not a minimum contact for you to have done that and be understood to have done that in a way that makes you deliberately inserting yourself into Pennsylvania? Because the contact wasn't with ARDAW U.S. There was zero contact whatsoever. There was contact with ARDAW in Luxembourg. And as in the Walden case, it has to be a direct contact with the state, not a contact that's incidental to it that comes in through the side door because they're insured. What does it mean, then, to have a local underlying policy be part of the global policy? I mean, if you hadn't done that, maybe you could be arguing this with greater force. It's hard to understand how you can say, well, you know, we had nothing to do with that. That's not us, when in terms of the global policy, it is part of the global policy. It's absorbed into and incorporated into the policy. Well, that's the reason why that's the case is for the benefit of the insured. It's because the type of coverage that's provided is excess or difference in condition. So all it's saying is it follows form to the underlying. I'm not arguing the business wisdom of it. I'm trying to understand how you can make the assertion that, hey, we've got nothing to do with that when you set it up so that that policy is part of, by the terms of the global policy, is part of the global policy. Two things, Your Honor. First of all, it's really just saying it follows form, which is the way all excess policies work. But second of all, it's not correct that AXA CS required ARDA to buy this local underlying policy from an AXA subsidiary. It's 100 percent within the discretion of the insured. As the policy says, if you look at appendix page 108, which is the provision in the policy, it says it's up to the insured for it to be a – all that is required for it to be a global – an underlying – local underlying policy, rather, excuse me, is that AXA can set. A subsidiary or somebody that AXA CS agrees is okay to write. Right. Or in section C, if that's not the case, if there's another local policy, then the global policy provides that we're excess of that, which is the case in liberty. But it's not – I'm pressing you because this is – I think it's important. You've taken the stand that this – there's just no minimum contact here. I'm puzzled by that because the way you've got your policy written, that local underlying policy is part of the global policy. So if you've done that, then the argument you have to be making is it doesn't matter whether we wrote in the jurisdiction or not. It doesn't matter that we wrote in the jurisdiction as a subsidiary of the main insured to this extent because we also provided in the contract that Irish law governs and all disputes have to be litigated in Ireland. So to the extent there was any purposeful availment of – with Pennsylvania based on the fact that RWS is a Pennsylvania resident, that was negated by – Okay, that takes you into the form selection clause. But before you get there, speak to fair play and substantial justice. Sure. As I was saying, the due process requires that parties be able to structure their primary conduct, that they be able to know where they're going to be sued and take steps to protect themselves against being sued in places where they don't want to be. That's exactly what Access CS did here. It's a foreign company, as the courts recognized. It wrote the policy. It's a global policy covering 25 different countries, and it expressly included the form selection clause because it didn't want to be hailed into court in 25 different countries. It's – Pennsylvania has no interest here. There's no Pennsylvania resident here. Well, your colleague here across the room points out, no, Pennsylvania's got a pretty strong interest here. It's got an insured, and it's an insured that was caught in a dispute between two insurers. You know, the classic, hey, I bought insurance from both you people, and now neither of you will pay me. What's going on here? You know, Pennsylvania hasn't – you're saying Pennsylvania doesn't have an interest in seeing that its residents who pay good money for insurance don't get hung out to dry by their insurance companies? I think Pennsylvania has a strong interest in that, but that's not this case. Well, that is – that's the argument being made to it. That is exactly this case, that you two wouldn't pay, you two being your subsidiary and Liberty. There was a dispute. Neither one was paying, and so it took months and years to get people to show up and give money, and it only happened after you asked – the CS said, tell you what, if Liberty pays you, we'll find out who owes what later. That you involved yourself in the dispute. You didn't have to, but you did, and that that's another step, and it shows both Pennsylvania's interest in this, and it shows you engaged in the process in a way that makes it – rings hollow for you to say unfair, unfair. That's the argument you've got to fight back against. I understand. That argument, I think, fails because if there was a lawsuit here that our dog, U.S., was involved in, then the interest of Pennsylvania would be apparent. The argument here is a hypothetical. If Liberty didn't pay, honor its obligations, and pay under its policy, then perhaps Pennsylvania would have an interest in protecting its insured. But Liberty issued a recall policy. It was a recall claim. It had no defense to the policy, and it just didn't pay because it wanted to extract money from other – Now you're into the merits, right? They say we did have a defense, which is you guys were on the hook too. You were on the hook too, and that's the merits, and we can fight about that, but the whole battle now is where is that fight going to be? So it doesn't help to go into the merits. You've got to stay up at the level we're at and say, why is it unfair for you in a Pennsylvania dispute involving a Pennsylvania resident for which your subsidiary wrote a policy which you incorporated into your global policy, why is it unfair for you to face the music in Pennsylvania? That's the pitch they're making to us. Right. Well, the most fundamental reason why it's unfair is that the only contact that we had was this policy, right? If you call that a contact with Pennsylvania, and I'll stipulate to your Honor's suggestion in that regard, the only contact was the global policy, and that policy says we can't be sued in Pennsylvania. We have to be sued in Ireland. So to hail AXA-CS across the ocean into a different legal system for the convenience of Liberty, who is not a Pennsylvania resident. Liberty is not a widow or an orphan. It's a large corporation. It can sue in Ireland if it wants to. Obviously, it would prefer to be here, but that's a matter of convenience, and that's what the Asahi factors recognize is hailing a foreign entity into this jurisdiction in the United States is not a matter of convenience. It's a fundamental issue of international comity, and it's a fundamental issue of due process, and particularly here when AXA-CS reasonably could have no contemplation that it would be sued in Pennsylvania based on a policy that absolutely requires that all suits be brought in Ireland. I have a question for you. There are a couple cases that are bandied about in the briefs. Eli Lilly, Farmers Insurance, which I'm sure you're familiar with. Yes. I guess you deal with them by saying they're old, and the Supreme Court has come out with Walden and Daimler. What about Walden and Daimler makes these cases, you know, weakens the holdings of those cases? Daimler, not so much because that's general jurisdiction. Right. And this is not our primary argument, but I think Walden, if not on the specific facts, but on the impression that it's conveyed, I think, to the bar, is that the Supreme Court is going to take a much stricter look at personal jurisdiction going forward. That's all I meant by that. The main basis for distinguishing those cases is twofold. One, the insured, the named insured that bought the policy was the plaintiff. It wasn't a subsidiary of a global policy, and it was a U.S. policy. We'd have a foreign insurer. And there was facts there that showed that the defendants, there was existing litigation involving insurer versus insurer lawsuits so that there was reason for them to anticipate being sued there. And finally, no forum selection clause. And the Farmers Insurance Exchange case is key on this. They said, we don't have any problem saying that the defendant can be sued here because they could have contracted around it if they wanted to. Well, that's what Access CS did. They contracted around it. They structured their primary conduct as the courts direct them to, and to just wipe that away and say, well, you know, you've got to be stuck in Pennsylvania here anyway, I think is fundamentally unfair. You've got to answer the question then that's being raised by Liberty that, yeah, that McGraw-Hill tells us that if you've got something incidental like this, you can't bind them to that, to your forum selection clause for your convenience. And it's not incidental, Your Honor. Because? Because they have three claims. One and three, it's a laydown hand. It's a declaratory judgment claim. One is a declaratory judgment claim for interpreting the policy. That's count one. Right. Count three is specific performance of the policy. So those are laydown hands. Number two is equitable contribution. That's where there's some argument. But paragraphs 92 to 94 of the complaint in the count, in count two, say, under the terms of the contract, you owed coverage. We get the benefit of that. And under specifically the other insurance clause, you owed coverage, and we get the benefit of that. That's not an incidental benefit. That's the basis of their claim. They can't prevail without it. In the Griswold case, Your Honor, from 2015, it was 762F3264. Is that in the brief? It was not. We raise it now because Liberty argued that the benefit has to be obtained during the life of the contract, that there's no, you know, if you come to sue on a contract or base your claim on a contract, that's not the type of benefit that is acknowledged for equitable estoppel. The Griswold case is directly the contrary. At page 272, that was an arbitration clause case. Page 272, it says a non-signatory can embrace a contract in two ways. One, by knowingly seeking and obtaining a direct benefit from that contract. Or two, by seeking to enforce the terms of that contract or asserting claims based on that contract's other provisions. And that number two from the Griswold case is exactly what Liberty is doing here. It's basing its claim expressly on the provisions of the Acts of Global Policy, and it can't do that without also accepting the burdens of that policy, which is to bring any dispute that it has in Ireland. How about the foreseeability forfeiture issue? You heard what your adversary said. Do you have any response to that? Well, they clearly waived it, and the question is whether the court in its discretion will excuse the waiver. I mean, they didn't raise it. I think they're saying we didn't have any obligation to raise it. That's just what they said, I think. Right. Well, if they want to argue it now, then they had an obligation to raise it. I mean, that's what the waiver rule is all about. And it's, A, foreseeability. On the merits, the evidence shows that they had the policy. So when they entered into the settlement and when they said they were going to assert contribution claims prior to the settlement with Argo. So they knew what the terms were. They sent letters quoting the policy. But beyond that, if they raise this, the issue could be resolved by a simple interrogatory from AXA saying, did you have the policy? When did you have it? And the fact that they're able to dispute this now or make some sort of issue of fact about it is based entirely on the fact that they didn't raise it below. So for that reason, it should be waived. And it's also just not good practice. It's not fair to this court. It's not fair to the district court for a party to simply not brief the issues and then save it all up for this court to deal with. That's our general policy. Hey, can we talk about the burden of proof for a second? There was no evidentiary hearing, right? There was not an evidentiary hearing, correct. What's the burden of proof? Is it our standard motion dismiss burden of proof? The standard is that they have to show either by well-pleaded allegations or that are not contradicted by the facts or by factual proofs that they've submitted that there's jurisdiction here. So I don't think there's anything alleged in the complaint that we would need to dispute in order to fight jurisdiction here. The real question is what were the contacts? And we don't dispute that we issued the policy that covers the subsidiary. It's a prima facie case is all they have to make out in the first instance, right? I do not believe so. I believe if there's a defense raised, they have to put forward some proofs. Now, the proofs could be they can rely on their complaint, but if we dispute facts, they have to put forward proofs. And there was some discovery here, right, on the jurisdictional issue? Yes, there was jurisdictional discovery. There were two depositions taken of AXA CS representatives. At the pleading stage, just a prima facie, once you say we don't think there's jurisdiction, then the responsibility comes in to come forward with proof, and there was jurisdictional discovery here. Yes, Your Honor. That's my understanding of the law. All right. Thank you, counsel. One last point, if I could indulge, Your Honors. Counsel for Liberty mentioned this comfort letter that seemed to suggest that we acknowledged a duty to provide contribution or a duty to litigate it in Pennsylvania. The comfort letter is A-295 to 298. It reserves all rights and says we don't believe we owe contribution, and, you know, this is completely without prejudice. So that letter does not help them. Okay, thanks. Thank you, Your Honor. Thank you, counsel. Briefly, Your Honor, on the aside test, which Your Honor mentioned, the first issue is the burden on defendant. Now, again, this is a 1987 case, obviously, Supreme Court. We are now in a different era. We took depositions by telephone conference. It's a global company which has now merged with a United States company. There's no burden. They're very familiar with being in the United States. Their argument on the law is that Asahi says that the burden is significant by the very fact that you're making a foreign company defend itself in a foreign jurisdiction. This is not a technologically-based argument. It's not a, you know, look how miraculous our communications are today. It's an international comity argument. That's the pitch they're making. What's wrong with it? Because they're a global company, and they write in Pennsylvania. They write all over this country. They're a global company. There's not a company that sent one port here that ended up in a car and somewhere like that. So in Asahi, you could make the very same argument. Asahi was sending its products all over the world, including into California, and that principle didn't sway the Supreme Court. They said we are not going to make them come from Japan to California to deal with a dispute that is not involving a California resident. Right, but here they entered into a contractual relationship with a Pennsylvania company by the excess insurance and the named insured, ARDER-US, which is a named insured. So I think it's stronger. On the second point, I've already discussed the interest in Pennsylvania to have its insureds protected and have the benefit of all their insurance. The plaintiff's interests are interests we have to talk about. We did not reach into Ireland to write insurance or to be involved in a dispute. They reached into Pennsylvania, and now we're talking about an entirely different jurisprudence that may apply. Okay, well, then that really takes you into the Form Selection Clause, and their assertion is you may not have reached into Ireland, but you're reaching in now because you're choosing to sue them on the contract. And if you're going to sue them on the contract, you're going to live with the contract, and that is a contract that specifically makes Ireland law apply and says you'll sue in Ireland. So if you want to benefit the contract, you'll carry the contract all the way through. Why don't you take them at that argument and start specifically with count one and count three, which they say, in his words, are a laydown hand. They're explicitly on the contract. How do you get around that for count one and count three? Because our only real right is the equitable contribution. There were alternative theories. So the only thing we're dealing here with is really count two? Yes. Okay, it's all about count two. Okay, and then their argument is you read count two, you read it, and it's all about the contract. So it doesn't matter what they call it. It's really about the contract. Your Honor, if I could just have 30 seconds, please. You can answer the question. It's just as in McGraw-Hill. There were two, and actually DuPont, actually McGraw-Hill, there's two contracts. We're both in privity, all right? So, yes, their obligation arises out of privity with R to U.S. Ours arises out of privity with U.S. So if they didn't have that contract, we wouldn't have our contribution right. But it's an equitable right of contribution that is our only legal right here. They didn't assign the contract to us. They refused. So, obviously, their obligations are triggered by that contract. That's what we're saying. Our rights are triggered by equitable contribution to ensure justice with the strong public policy reasons. I don't understand them to be disputing that. I don't think – I don't understand them, you know, to be saying, if you're right that you had a claim, it wouldn't be – if you're correct that you had some claim, that there was a contractual benefit that you might have some equitable claim on, assuming all the facts were as you like to say they are. I understand them to be saying it was fully foreseeable to you, and, in fact, you did foresee that this contract had this form selection clause. And it's not an incidental benefit. It's central to it. It's with the very thing that the courts have been telling insurance companies to do, set up your affairs. They set them up that way. And you, a sophisticated party of all people, insurance company, have to respect that. It's not incidental. It's central to the character of the insurance, the global insurance policy. Your Honor, we didn't know about it. They didn't know about ours. We entered our contract with our venue provision, not anticipating. Which is in Pennsylvania. It's New York. But I would be – how could I argue New York, given that under McGraw-Hill, you know, I can't be inconsistent. Pennsylvania is the only place where everybody meets. Everyone meets. Not in Ireland. Ireland has no interest in this. They're not an Irish company. They're Belgium. And so, Your Honor, it's the definition of incidental, because it's purely happenstance there with these concurrent. And it would be against public policy to have the insurer that steps up and pays, and then the court recognizes this strong, equitable right to contribution, say, oh, by the way, if you assert your contribution, you're bound by their foreign selection clause. Thank you. I'm sorry. You've mentioned a few times that your friend's client has merged. What's the significance of that? Why does it matter if they've been bought or merged? Well, it just goes that they're – first of all, I don't think having a foreign selection clause is relevant to foreseeability in terms of being in a jurisdiction, because it has to do with your contacts and your conduct there. I was just saying that it's not inconvenient for them. They're a global company, and they have even more of a United States presence. I'm just – you know, this is – you know, they're not asking us to go to Pennsylvania or New York. And they are here. We are not there. Thank you. Okay. Thank you. We'll take questions.